**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

---

ALEXANDER LENNON,

      Plaintiff,

     v.                                                               Case Number: 25-815

ALKAR-RAPIDPAK, INC.;
THE MIDDLEBY CORPORATION,

      Defendants.

---

### AMENDED COMPLAINT

---

NOW COMES the Plaintiff, Alexander Lennon, through his undersigned counsel, and, as and for an Amended Complaint against the above-named Defendants, ALKAR-RapidPak, Inc. and The Middleby Corporation, alleges and shows to the Court as follows:

### NATURE OF THE CASE

1.     This action brought by Plaintiff Alexander Lennon, alleges that Defendants, ALKAR-RapidPak, Inc. and The Middleby Corporation, acting as joint employers, denied payment of overtime premium wages at one and one-half times the regular rate for hours worked over forty (40) hours per workweek. Lennon was employed by Defendants as a CAD Application Engineer from February 21, 2022 through April 4, 2024. During that period, Lennon regularly worked sixty to eighty hours per week, and in excess of ninety to one hundred hours per week during critical project periods. Defendants misclassified Lennon as exempt from the overtime requirements of 29 U.S.C. Section 207, paid him a fixed salary regardless of hours worked, and refused to pay him overtime premium compensation at one and one-half times his regular rate of pay for all hours worked in excess of forty per workweek.

2.     Lennon also brings supplemental claims against Defendants for non-payment of overtime and earned paid-time-off, in violation of Wis. Stat. Ch. 109.

**JURISDICTION AND VENUE**

3.      This court has original jurisdiction to hear this complaint and to adjudicate the claims stated herein under 28 U.S.C. § 1331, this action being brought under the FLSA, 29 U.S.C. § 201, *et seq.*

4.      The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, as they are so related in this action within original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

5.      Pursuant to 28 U.S.C. § 1391(b) and (c), venue is proper in this Court because a substantial part of the events or omissions giving rise to Lennon's claims occurred in this District and Defendants maintain substantial and systematic contacts in this District.

**DEMAND FOR JURY TRIAL**

6.      Lennon hereby demands a trial by jury, pursuant to Fed.R.Civ.P. 38(b).

**PARTIES**

7.      Plaintiff Alexander Lennon ("Lennon") is an adult whose address is 215 S. Century Ave, #227, Waunakee, WI 53597. Lennon was employed by ALKAR-RapidPak, Inc. and The Middleby Corporation during the time period prescribed by the applicable statutes of limitations.

8.      Defendant ALKAR-RapidPak, Inc. ("ALKAR") is a corporation organized and existing under the laws of the State of Wisconsin, engaged in manufacturing from its headquarters located at 932 Development Drive, Lodi, WI 53555. ALKAR is an enterprise engaged in commerce within the meaning of 29 U.S.C. Section 203(s)(1).

9.      Defendant The Middleby Corporation ("Middleby") is a publicly traded Delaware corporation with its principal offices at 1400 Toastmaster Drive, Elgin, Illinois 60120. Middleby is the parent corporation of ALKAR and, upon information and belief, exercises operational control over ALKAR's employment practices, human resources policies, information technology infrastructure, and employee work assignments beyond the level of normal shareholder oversight. Middleby is an "employer" of Lennon within the

meaning of 29 U.S.C. § 203(d), Wis. Stat. Section 109.01, and a joint employer under the economic reality test.

**OPERATIVE FACTS**

*Employment and Job Classification*

10.     Lennon was hired by ALKAR on February 21, 2022, as a CAD Application Engineer, pursuant to a written offer letter from Craig Bonneville, Vice President of Innovation & Continuous Improvement.

11.     ALKAR's job description for Lennon's position, created in November 2021, states "FLSA: Non-Exempt", which indicates that Lennon is eligible for overtime compensation

12.     Lennon's job description contains the following General Summary: "Primarily provide support for solutions implementation and cross product integration and automation. Work with MRP/ERP Solutions Consultant to integrate Metadata flow between CAD and MRP/ERP systems. Additionally provide CAD Management support while teaching internal resource(s) to take over CAD Admin duties."

13.     Notwithstanding ALKAR's "FLSA: Non-Exempt" classification in its job description, ALKAR's Employee Status Forms contain an "Exempt" checkbox that is marked. ALKAR has refused to explain when or why the classification was changed, objecting to Lennon's Interrogatory No. 10 as "not relevant."

14.     Defendants misclassified Lennon as an exempt from over-time employee knowing he was not employed in a bona fide executive, administrative, or professional capacity, and did not perform duties qualifying for any recognized exemption under 29 U.S.C. Section 213(a)(1) or the regulations at 29 C.F.R. Part 541.

15.     Lennon did not perform primary duties directly related to management or general business operations.

3

16.     Lennon did not perform primary duties that included the exercise of discretion and/or independent judgment. ALKAR's own position statement described Lennon as requiring his supervisor's "constant attention and supervision."

17.     Lennon did not perform primary duties of management of the enterprise or a recognized subdivision thereof.

18.     Lennon did not customarily and regularly direct the work of two or more other employees.

19.     Lennon did not have the authority to hire or fire persons, and his opinions or recommendations were not sought and were not given particular weight regarding the hiring, firing, and promotion of individuals.

20.     Lennon's primary duties included CAD administration and PDM management (SolidWorks Manage, PDM, Vault systems), IT help desk functions for the entire company, hardware setup and maintenance for the manufacturing floor, Smartsheet implementation and licensing negotiation, project coordination for third-party vendor integrations, and support for Middleby India remote users. Lennon did not perform computer systems analysis, programming, software engineering, or similar technically creative functions during his entire term of employment.  He did not hard-code or program anything. He relied on others with computer science backgrounds for such work.

21.     In March 2024, Defendants enrolled Lennon in a custom CADSharp training program at a cost of approximately $10,000 to $20,000, to provide Lennon with computer science skills he did not possess. Lennon was on the third day of this multi-day program at the time his employment was disrupted. Defendants' investment in this training is inconsistent with both (a) any claim that Lennon's primary duties constituted those of a computer professional under 29 C.F.R. Section 541.400, and (b) any claim that Lennon's performance warranted

termination.

22.    During the relevant period, ALKAR employed Dezmond Revord in IT functions on an hourly, non-exempt basis. Lennon performed work in the same IT task categories as Revord, including help desk support, hardware maintenance, and system administration, a majority of his working time. Despite performing substantially similar work, Lennon was classified as salaried through the Engineering department rather than hourly through IT. Upon information and belief, this classification was designed to avoid the time-tracking requirements that applied to Revord's hourly position.

23.    Lennon was not employed in a managerial capacity as contemplated by Wis. Stat. Ch. 109.

### Co-Employer Middleby Corporation

24.    ALKAR is a wholly owned subsidiary of Middleby. Under 29 U.S.C. Section 203(d), "employer" includes any person acting directly or indirectly in the interest of an employer in relation to an employee. This definition is to be construed broadly to effectuate the Act's remedial purposes.

25.    Upon being hired by ALKAR, Lennon was required to sign a Confidentiality Agreement with The Middleby Corporation (not ALKAR-RapidPak, Inc.), which included an employment-at-will provision and a third-party beneficiary clause extending the agreement to "Company affiliates."

26.    Lennon was required to comply with Middleby's Code of Conduct, signed by Middleby CEO Timothy J. FitzGerald, and issued to all ALKAR employees.

27.    Middleby Corporation integrated Lennon into its corporate IT infrastructure by provisioning him an alex.lennon@middleby.com identity management credential. This was not a mere communication alias, but a service account granting Lennon administrator-level access to

5

Middleby's CyberQuery financial reporting systems across multiple subsidiaries, including Baker Thermal, Jade, Stewart, and Middleby Marshall.

28. As part of his job duties, Lennon was required to provide IT support to Middleby's engineers in India, across two shifts, including evenings and weekends.

29. Defendants suffered and permitted Plaintiff to work extensive overtime by structuring his responsibilities such that around-the-clock IT availability was effectively required. If Lennon was unavailable during evenings, weekends, or holidays, critical systems and Middleby India operations would go unsupported, and Lennon understood he would face adverse consequences for any gaps in availability. Specifically, Lennon was required to support Middleby India personnel across both first and second shifts, necessitating regular active work beginning at approximately 9:30 or 10:30 PM Central Time (depending on daylight savings), corresponding to the start of the India first shift, and continuing through the India second shift. Lennon routinely performed active, after-hours interventions via remote ConnectWise sessions and remote workstation support (e.g., IT ticket HD-1233), which Defendants assigned, operationally relied upon, and knew could not be completed within a forty-hour workweek.

30. Middleby Corporate personnel directly assigned and supervised Lennon on Middleby Corporation projects. Joe Molner, an executive of Middleby, directed Lennon in his work on the CyberQuery project, stating that Lennon would "lead this as a project" and that "this can be his baby to really launch." Alfred Zhu, an executive of Middleby, directed Lennon thru Joe Molner in his work on the infor-XA cloud upgrade, using Middleby's resources, to the benefit of Middleby, not ALKAR.

31. Middleby exercised operational control over Lennon's employment beyond the level of normal shareholder oversight, including: (a) requiring Lennon's execution of Middleby's Confidentiality Agreement; (b) mandating compliance with Middleby's Code of Conduct; (c)

provisioning Lennon with Middleby IT credentials and administrator-level access; (d) directly assigning and supervising Lennon's work for Middleby's cross-subsidiary operations; (e) routing Lennon's communications through Middleby's email system; and (f) providing health benefits to Lennon through Middleby's corporate benefits program.

32.    Upon information and belief, Middleby participated in or influenced the decision to terminate Lennon's employment.

### Hours Worked and Overtime

33.    Defendants established the weekly schedule for Lennon, including requiring him to work more than forty (40) hours in a workweek.

34.    Lennon regularly worked in excess of forty (40) hours in a week in various workweeks during the relevant statutory period. During representative normal workweeks, Lennon worked approximately sixty to eighty hours per week. During the Infor-XA ERP cloud migration in January and February 2024, Lennon worked approximately ninety to one hundred or more hours per week.

35.    Defendants' policy was to pay Lennon a fixed weekly rate for the work he performed regardless of the number of hours worked.

36.    At no time was there a clear and mutual understanding between Lennon and Defendants that Lennon would receive a fixed salary as compensation for all hours worked, regardless of the number of hours. Lennon did not knowingly agree to a fluctuating workweek arrangement, and no such arrangement was communicated to him orally or in writing. The offer letter makes no reference to a fixed salary for all hours worked. Defendants provided no onboarding materials, employment agreements, or written communications establishing any mutual understanding that Lennon's salary covered all hours regardless of workweek length.

37.    As a result of Defendants' policy to pay Lennon the same flat weekly rate

regardless of the number of hours he worked, Defendants did not pay Lennon overtime compensation at time and one-half his regular rate for hours worked over forty (40) in a workweek during the relevant statutory period.

38.    Upon information and belief, Defendants do not maintain complete and accurate time records for Lennon. ALKAR objected to interrogatories and requests for production regarding overtime and timekeeping as "not relevant to any party's claims or defenses. . . . not proportional to the needs of the case."

### Recordkeeping

39.    Defendants failed to maintain complete and accurate time records for Lennon as required by 29 U.S.C. Section 211(c) and 29 C.F.R. Part 516. ALKAR objected to interrogatories and requests for production regarding overtime and timekeeping as "not relevant to any party's claims or defenses" and "not proportional to the needs of the case."

40.    Because Defendants failed to maintain accurate time records as required by law, Lennon is entitled to establish his hours worked through reasonable estimates and just and reasonable inferences pursuant to *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946). Based on these reasonable estimates, Lennon consistently worked approximately eighty or more hours per week, and in excess of one hundred hours per week during the January-February 2024 ERP release. The burden therefore shifts to Defendants to negate the reasonableness of these estimates with evidence of the precise amount of work performed.

### Compensation

41.    Lennon's starting annual salary was $95,000, with a guaranteed $5,000 increase after four months. His salary was subsequently increased to $100,000, then approximately $103,000, and finally to approximately $107,635 effective March 1, 2024 (applied retroactively to January 2024).

42.     The 2024 HCE (Highly Compensated Employee) threshold under 29 C.F.R. § 541.601 was $107,432. Lennon's salary did not exceed this threshold until the retroactive raise applied as of March 1, 2024, approximately one month before his termination. The HCE exemption therefore cannot apply to the vast majority of Lennon's employment.

43.     A paycheck dated February 23, 2024 reflects an hourly rate of $49.52 during a period when the raised salary should have been in effect. ALKAR did not actually pay Lennon the raised salary.

44.     During his employment, Lennon was required to engage and personally pay third-party contractor Awais Mazahir a total of $7,385.84 from his own funds through his personal business, Anywave Creations LLC, to complete ALKAR deliverables, including the DriveWorks 3D configurator project. Lennon lacked budget authority to commit ALKAR resources for this work, which was directed by his supervisor. ALKAR has not reimbursed these expenditures. Lennon's lack of spending authority is inconsistent with any claim that he exercised the discretion and independent judgment required for the administrative exemption under 29 C.F.R. Section 541.200. Furthermore, Lennon was required to utilize his personal Anywave accounts to fund Smartsheet subscriptions (e.g., Invoices INV680700 and INV680704) because he lacked the independent authority to commit company funds.

***Protected Activity***

45.     During April 2023, Lennon emailed Bonneville a "Request for Meeting" stating that his pay was "not commensurate with job expectations," referencing hours worked, and objecting, "[t]his is advanced technical work that is beyond the scope of my current pay schedule."

46.     On or about April 19, 2023, Lennon notified Bonneville in writing that his salary was not commensurate with job expectations.

9

47. During May 2023, Lennon notified Defendants that his hours and compensation were in violation of the FLSA.

48. These communications constituted protected activity within the meaning of 29 U.S.C. § 215(a)(3). Lennon's complaints provided Defendants with fair notice that his grievance concerned wages and hours under the FLSA.

### *Termination of Employment*

49. During February 2024, Lennon received a performance review score of 3.2 out of 5.0.

50. During March 2024, ALKAR applied a cost-of-living salary increase for Lennon, retroactive to January 2024, raising his salary to approximately $107,635.

51. On April 4, 2024, Brooke Denu and Bonneville terminated Lennon's employment.

52. Lennon was presented with a severance agreement, which he declined.

53. At no point prior to Lennon's protected activity in April and May 2023 had Defendants taken or threatened any adverse employment action against Lennon. After Lennon's complaints about FLSA violations, Defendants' treatment of Lennon materially changed.

54. Despite having received no formal disciplinary action or Performance Development Plan, and despite having received positive feedback from his direct supervisor regarding his work, Lennon was terminated. At the time of termination, Bonneville stated he "could not fight harder to keep you at ALKAR." Defendants offered no contemporaneous, documented performance-related explanation for the termination.

55. The temporal gap between Lennon's protected activity and his termination is explained by Defendants' business necessity: Defendants retained Lennon to execute a mission-critical Infor-XA ERP cloud migration during late 2023 and early 2024, requiring him to work

10

extended hours. Defendants terminated Lennon shortly after this critical project was substantially completed and his utility to the enterprise diminished.

56.    The Wisconsin Department of Workforce Development determined that Lennon's termination was not for misconduct or substantial fault.

57.    Defendants' conduct, as set forth in this Complaint, was willful and in bad faith, and has caused significant damages to Lennon.

### Accrued Unpaid Vacation Pay

58.    During each year of Lennon's employment with Defendants, he accrued 14 days of PTO and 10 paid holidays, as set forth in his January 31, 2022 offer letter, which Lennon accepted.

59.    As of January 27, 2023, Lennon's paystub reflected 128 hours of available PTO and 80 hours of available holiday time.

60.    Defendants have failed to pay Lennon's earned PTO.

61.    ALKAR has refused to produce PTO ledgers or its written PTO policy in discovery, in response to Lennon's document request No. 28, claiming it is, "not proportional to the needs of the case."

**FIRST COUNT**
**VIOLATION OF THE FLSA — UNPAID OVERTIME**
**(29 U.S.C. § 201, *et seq*.)**

62.    As and for a First Count, Lennon re-asserts the allegations recited above and fully incorporates those paragraphs herein by reference.

63.    Throughout the statutory period, Lennon has been entitled to the rights, protections, and benefits provided under the FLSA, 29 U.S.C. § 201 *et seq*.

64.    Defendants are enterprises engaged in commerce within the meaning of 29 U.S.C. § 203(s)(1).

65.     Throughout the statutory period, Defendants are and were the joint employers of Lennon as provided under the FLSA.

66.     Defendants violated the FLSA by failing to account for and pay Lennon mandated overtime premium compensation for each hour that Lennon worked in excess of forty (40) hours each workweek.

67.     Lennon is entitled to damages equal to mandated overtime premium pay within the three years prior to the filing of the complaint, plus periods of equitable tolling, because Defendants acted willfully and knew or showed reckless disregard for whether its conduct was prohibited by the FLSA. Defendants' willfulness is demonstrated by the fact that its own job description classified Lennon's position as "FLSA: Non-Exempt," yet they refused to pay his overtime compensation.

68.     Defendants' failure to properly compensate Lennon and failure to properly record all compensable work time was willfully perpetrated and Lennon is therefore entitled to recover an award of liquidated damages in an amount equal to the amount of unpaid overtime premium pay described above, pursuant to 29 U.S.C. § 216(b).

69.     Alternatively, should the Court find that ALKAR did not act willfully in failing to pay mandated overtime premium wages, Lennon is entitled to an award of pre-judgment interest at the applicable legal rate.

70.     Pursuant to 29 U.S.C. § 216(b), if successful, Lennon is entitled to reimbursement of the costs and attorneys' fees expended in prosecuting this lawsuit for unpaid overtime premium compensation.

**SECOND COUNT**
**VIOLATION OF WISCONSIN WAGE CLAIM LAW — UNPAID OVERTIME**
**(Wis. Stat. Ch. 109)**

71.     As and for a Second Count, Lennon re-asserts the allegations recited above and

fully incorporates those paragraphs herein by reference.

72. Throughout the statutory period, Lennon was an employee within the meaning of Wis. Stat. §§ 109.01, 103.001, 104.01.

73. Throughout the statutory period, Defendants were Lennon's joint-employers within the meaning of Wis. Stat. § 109.01.

74. Throughout the statutory period, Defendants were Lennon's joint-employers within the meaning of Wis. Stat. § 103.001.

75. Throughout the statutory period, Defendants were Lennon's joint-employers within the meaning of Wis. Stat. § 104.01.

76. Throughout the statutory period, Defendants were Lennon's joint-employers within the meaning of Wis. Admin. Code DWD 272.01.

77. Throughout the statutory period, Defendants were Lennon's joint-employers within the meaning of Wis. Stat. § 109.01 et seq.

78. Throughout the statutory period, Defendants were Lennon's joint-employers within the meaning of Wis. Stat. § 103.01 et seq.

79. Throughout the statutory period, Defendants had employed Lennon within the meaning of Wis. Stat. § 104.01 et seq.

80. Throughout the statutory period, Defendants had employed Lennon within the meaning of Wis. Admin. Code DWD 272.01 et seq.

81. Throughout the statutory period, Defendants had employed Lennon within the meaning of Wis. Admin. Code DWD 274.01 et seq.

82. Throughout the statutory period, Lennon regularly performed activities that were an integral and indispensable part of his principal activities without receiving compensation for these activities.

83.    At all relevant times, Defendants had common policies, programs, practices, procedures, protocols, routines, and rules of willfully failing to properly pay Lennon the mandated overtime compensation.

84.    Wis. Stat. § 109.03 requires payment of all wages earned by the employee to a day not more than 31 days prior to the date of payment.

85.    The foregoing conduct constitutes continuing, willful violations of Wisconsin law requiring the payment of overtime wages.

86.    Lennon has sustained losses in his compensation as a proximate result of Defendants' violations of Wisconsin law.

87.    Accordingly, Lennon seeks damages in the amounts of his unpaid compensation, injunctive relief requiring Defendants to cease and desist from their violation of the Wisconsin law described herein and to comply with it, and such other legal and equitable relief as the Court deems just and proper. Under Wis. Stat. § 109.11, Lennon may be entitled to exemplary damages equal and up to fifty percent (50%) of the unpaid wages.

88.    Lennon seeks recovery of attorneys' fees and the costs of this action to be paid by Defendants, pursuant to Wisconsin law.

**THIRD COUNT**
**FLSA RETALIATION**
**(29 U.S.C. § 215(a)(3))**

89.    As and for a Third Count, Lennon re-asserts the allegations recited above and fully incorporates those paragraphs herein by reference.

90.    Section 215(a)(3) of the FLSA makes it unlawful for any person "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA], or has testified or is about to testify in any such proceeding."

14

91.     Lennon engaged in protected activity under 29 U.S.C. § 215(a)(3) when he complained to Defendants, orally and in writing, that his hours and compensation were in violation of the FLSA:

A.      In April 2023, Lennon sent a written "Request for Meeting" to his supervisor Craig Bonneville, stating his pay was "not commensurate with job expectations," referencing the scope of his work, the hours required, and characterizing his duties as "advanced technical work that is beyond the scope of my current pay schedule."

B.      On or about April 19, 2023, Lennon notified Bonneville in writing that his salary was not commensurate with job expectations given his hours and duties.

C.      In May 2023, Lennon orally notified Defendants that his hours and compensation were in violation of the FLSA.

92.     These communications gave Defendants fair notice that Lennon believed he was not being compensated consistently with the FLSA.

93.     Bonneville, the individual who received Lennon's complaints, forwarded Lennon's written complaints to Brooke Denu (HR Manager) and Tom Betley (ALKAR President) on or about May 3, 2023, thereby establishing that the decisionmakers responsible for Lennon's subsequent termination had actual knowledge of his protected activity.

94.     Following Lennon's complaints about FLSA violations in April and May 2023, Defendants' treatment of Lennon materially changed. Despite having no formal disciplinary action or performance improvement plan, and despite having received positive feedback from his direct supervisor regarding his work, Lennon was terminated on approximately April 4, 2024. At no point prior to his protected activity had Defendants taken or threatened any adverse employment action against Lennon. Defendants offered no contemporaneous, performance-

15

related explanation for the termination.

95.    The temporal gap between Lennons protected activity and his termination is further explained by Defendants business necessity: Defendants retained Lennon to execute a mission-critical Infor-XA ERP cloud migration during late 2023 and early 2024, requiring him to work extended hours. Defendants terminated Lennon shortly after this critical project was substantially completed and his utility to the enterprise diminished.

96.    The temporal sequence, the change in treatment following Lennon's complaints, and the absence of a legitimate basis for termination support a reasonable inference that Lennon's protected activity was a motivating factor in his discharge.

97.    As a direct and proximate result of Defendants' retaliation, Lennon has suffered damages including, but not limited to, lost wages, lost benefits, emotional distress, and damage to his professional reputation.

98.    Defendants' retaliation was willful and in bad faith.

99.    Pursuant to 29 U.S.C. § 216(b), Lennon is entitled to recover his lost wages, an equal amount in liquidated damages, and reasonable attorneys' fees and costs.

**FOURTH COUNT**
**WISCONSIN PTO WAGE CLAIM**
**(Wis. Stat. §§ 109.01, 109.03)**

100.    As and for a Fourth Count, Lennon re-asserts the allegations recited above and fully incorporates those paragraphs herein by reference.

101.    Lennon's January 31, 2022 offer letter granted him 14 days of PTO and 10 paid holidays per year, which Lennon accepted. This PTO benefit constitutes an agreed-upon term of Lennon's employment.

102.    Wis. Stat. § 109.01(3) defines wages to include "vacation pay and any other similar advantages agreed upon between the employer and the employee or provided by the

employer to the employees as an established policy." Lennon's PTO therefore constitutes "wages" within the meaning of the statute.

103. Lennon accrued 128 PTO hours and 80 holiday hours as of January 27, 2023.

104. Wis. Stat. § 109.03(1) requires an employer to pay all wages earned by a terminated employee no later than the next regular payroll date following the date of termination.

105. Defendants willfully failed to pay Lennon his accrued and unused PTO following the termination of his employment.

106. ALKAR is preventing Lennon from calculating his wage losses by refusing to produce PTO ledgers and its written PTO policy in response to Lennon's discovery requests claiming such records are "not proportional to the needs of the case."

107. Pursuant to Wis. Stat. § 109.11(2), Lennon is entitled to recover the amount of unpaid wages, increased by an amount not to exceed fifty percent (50%) of the unpaid wages as exemplary damages, plus reasonable attorneys' fees and costs.

## FIFTH COUNT
## JOINT EMPLOYER LIABILITY — THE MIDDLEBY CORPORATION
### (29 U.S.C. §§ 203(d), 207, 216(b))

108. As and for a Fifth Count, Lennon re-asserts the allegations recited above and fully incorporates those paragraphs herein by reference.

109. 29 U.S.C. § 203(d) defines "employer" to include any person acting directly or indirectly in the interest of an employer in relation to an employee

110. Pursuant to 29 U.S.C. Section 203(e)-(g) The FLSA's definition of "employer" is construed broadly to effectuate the Act's remedial purposes.

111. Middleby is liable as ALKAR's parent corporation under the economic reality test because Middleby: (a) exercised operational control over ALKAR's employment decisions; (b) directly supervised and assigned Lennon's day-to-day work; (c) had the power to hire, fire, or

17

modify conditions of Lennon's employment; and (d) benefited simultaneously with ALKAR from Lennon's work.

112.    Middleby exercised operational control over Lennon's employment beyond the level of normal shareholder oversight including:

A.    Requiring Lennon to execute Middleby's Confidentiality Agreement (not ALKAR's);

B.    Mandating compliance with Middleby's corporate Code of Conduct;

C.    Provisioning Lennon with a Middleby identity management credential (alex.lennon@middleby.com) granting administrator-level access to Middleby's CyberQuery financial reporting systems across multiple subsidiaries;

D.    Directing Lennon's work through Middleby executives Joe Molner and Alfred Zhu on cross-subsidiary projects;

E.    Requiring Lennon to support Middleby India operations across two shifts, including evenings and weekends;

F.    Providing Lennon's health benefits through Middleby's corporate benefits program; and

G.    Upon information and belief, participating in or influencing the decision to terminate Lennon's employment.

113.    As Lennon's joint employer within the meaning of 29 U.S.C. § 203(d), Middleby is jointly and severally liable for all FLSA violations alleged in this Complaint.

114.    Middleby's violations of the FLSA were willful and in bad faith.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Alexander Lennon demands relief as follows:

A. Issuance of an order, pursuant to 28 U.S.C. §§ 2201–2202, declaring and finding that

Defendants' actions described in this Complaint are unlawful and in violation of the FLSA and Wisconsin law;

B. An order finding that Defendants' violations of the FLSA and Wisconsin law were willful;

C. Judgment against Defendants, jointly and severally, in the amount equal to Plaintiff's unpaid wages at the applicable overtime rates;

D. Judgment against Defendants, jointly and severally, in the amount equal to Plaintiff's unpaid PTO/vacation wages;

E. An award of liquidated damages in an amount equal to the unpaid overtime wages, pursuant to 29 U.S.C. § 216(b);

F. An award of liquidated damages on the retaliation claim, including lost wages and an equal amount in liquidated damages, pursuant to 29 U.S.C. § 216(b), against Defendants jointly and severally;

G. An award of exemplary damages of up to fifty percent (50%) of unpaid wages, pursuant to Wis. Stat. § 109.11;

H. An award of all costs and attorneys' fees incurred prosecuting these claims;

I. Pre-judgment and post-judgment interest at the applicable legal rate; and

J. Such further relief as the Court deems just and equitable.

Dated this 3rd day of June, 2026.

*Electronically signed by Alan C. Olson*
Alan C. Olson, Bar No. 1008953
Nicholas O. Yurk, SBN: 1095278
Attorneys for Plaintiff
Alan C. Olson & Associates, S.C.
2880 S. Moorland Rd.
New Berlin, WI 53151
Telephone: (262) 785-9606
Fax: (262) 785-1324
Email: AOlson@Employee-Advocates.com